IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                    Criminal No. ELH-13-0629

GARY HOWARD.
*Defendant*.

**MEMORANDUM OPINION**

Gary Howard, defendant, entered a plea of guilty on June 23, 2014, to the offenses of interference with commerce by robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). ECF 52.  He was also charged as an aider and abetter, under 18 U.S.C. § 2.  *Id.*  The plea was tendered pursuant to a Plea Agreement.  ECF 54.  At sentencing on September 2, 2014 (ECF 68), Judge William Quarles, Jr. sentenced Howard to 151 months of imprisonment for the Hobbs Act robbery, and 84 months of imprisonment, consecutive, for his conviction under 18 U.S.C. § 924(c), for a total sentence of 235 months of imprisonment.  ECF 69 ("Judgment") at 2.[1]

Defendant, who is now self-represented, filed a "Motion For Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)."  ECF 180; ECF 180-1 to ECF 180-2 (collectively, the "Motion").  The government opposes the Motion.  ECF 184; ECF 184-1 to ECF 184-2 (collectively, the "Opposition").  Defendant has replied.  ECF 187 ("Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion, in part.  In particular, I shall reduce defendant's sentence for

---

[1] The case was reassigned to me on September 8, 2015, due to the retirement of Judge Quarles.  *See* Docket.

Hobbs Act robbery from 151 months of imprisonment to 130 months of imprisonment. Defendant's sentence under 18 U.S.C. § 924(c) shall remain unchanged. Therefore, as modified, defendant's sentence shall total 214 months of imprisonment.

## I.    Background

In an eight-count Superseding Indictment returned on January 16, 2014 (ECF 27), a grand jury in the District of Maryland charged Howard and two other defendants with one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); three counts of Hobbs Act robbery (Counts Two, Four, and Six); and three counts of using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts Three, Five, and Seven). Howard was also charged with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count Eight).

Defendant was arrested on February 24, 2014. ECF 40. He has been in custody since that date. ECF 42, ECF 45. As noted, on June 23, 2014, Howard entered a plea of guilty to one count of Hobbs Act robbery (Count Two) and one count of use of a firearm in furtherance of a crime of violence (Count Three). ECF 52. Count Two concerned a robbery of a convenience store on July 26, 2013, at approximately 3:30 a.m. *See* ECF 27.

The Plea Agreement (ECF 54) contained a stipulation of facts. *Id.* ¶ 6(a). There, the defendant agreed that he "participated in at least seven armed commercial robberies" between July 18, 2013 and July 26, 2013. *Id.* All of the stores were 7-Eleven convenience stores, and the stipulation includes information as to each armed robbery. *Id.* Defendant also "admit[ted] that he knew, prior to each robbery, that a firearm would be brandished during the robbery." *Id.*

In the Plea Agreement, the parties agreed that Howard had a "combined" offense level of 30 for Count Two, which took into account all seven robberies to which defendant admitted. *Id.*

¶ 6(b).  Further, the parties agreed that, if Howard were determined to be a Career Offender pursuant to § 4B1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), his offense level would increase to 32.  *Id.*  In addition, the parties agreed to three deductions for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1.  *Id.* ¶ 6(d).  Count Three required a mandatory minimum term of imprisonment of seven years, with a maximum of life.  *Id.* ¶ 3.  The parties agreed that, under 18 U.S.C. § 924(c)(1)(A)(i), the sentence would be at least seven years of imprisonment, consecutive to any other sentence.  *Id.* ¶6(c).  There was no agreement as to defendant's "criminal history or criminal history category."  *Id.* ¶ 6(e).

Notably, in the Plea Agreement, the government agreed to recommend a sentence within the Guidelines range as calculated by the Court at sentencing.  *Id.* ¶ 8.  And, defendant reserved the right to appeal any sentence that exceeded the Guidelines range.  *Id.* ¶ 10(b).

According to the Presentence Report (ECF 64, "PSR"), defendant entered the juvenile justice system at age eleven, *id.* ¶ 83, and he committed multiple offenses as a juvenile.  *Id.* ¶¶ 83-94.  Moreover, defendant had ten prior adult criminal convictions, all in Maryland state courts in Baltimore.  *Id.* ¶¶ 96–123.  The offenses included, *inter alia*, two convictions for possession of a handgun, one in 1993 and the other in 2000.  *Id.* ¶¶ 96, 100.  He also had three convictions for drug distribution offenses, in 1993, 1999, and 2004, *id.* ¶¶ 96, 105, 111; a conviction in 2001 for second degree rape, *id.* ¶ 108; and two convictions for failure to register as a sex offender, one in 2009 and the other in 2010.  *Id.* ¶¶ 114, 122.

Defendant had thirteen criminal history points, which established a criminal history category of VI.  *Id.* ¶ 124.  Moreover, the PSR determined that defendant qualified as a Career Offender under § 4B1.1 of the Guidelines.  *Id.* ¶ 125.  Defendant's status as a Career Offender also established a criminal history category of VI.  *Id.*

After a three-point deduction for acceptance of responsibility under U.S.S.G. § 3E1.1, defendant had a final offense level of 29 for Count Two.  *Id.* ¶ 80; *see also* ECF 184-2 (Sentencing Transcript) at 4.  For Count Two, the Guidelines called for a sentence ranging between 151 to 188 months of imprisonment.  ECF 64, ¶ 154.  Pursuant to U.S.S.G. § 2K2.4, the Guidelines sentence for Count Three was the minimum sentence required by statute, 18 U.S.C.  924(c)(1)(A)(ii), *i.e.*, 84 months, consecutive to any other sentence.  *Id.* ¶ 81.  Therefore, defendant had a total Guidelines range of 235 to 272 months of imprisonment.

At the time of sentencing on September 2, 2014 (ECF 68), defendant was 37 years old. ECF 65 at 2.  The PSR reflected a history of mental health issues (*id.* ¶ 166) and substance abuse dating to age 12.  *Id.* ¶¶ 168, 169.  Defendant also claimed that he was shot in the head in 1994, but the hospital records were not available.  *Id.* ¶ 167.  As a result of that occurrence, defendant claimed that he had short term memory loss, which led to his inability to obtain a GED.  *Id.* ¶¶ 167, 170.

The government recommended a sentence of 151 months of imprisonment for Count Two and 84 months, consecutive, for Count Three.  ECF 184-2 (Sentencing Transcript) at 6.  Thus, the government sought a total sentence of 235 months of imprisonment.  *Id.*

In his argument, defense counsel pointed to video footage of the robberies.  He claimed that the videos established that defendant "did not personally brandish a firearm . . . ."  *Id.* at 8.

Judge Quarles carefully reviewed the defendant's background.  *Id.* at 16.  For Count Two, he sentenced Howard to a sentence of 151 months of imprisonment, which corresponded to the bottom of the Guidelines, as reflected in the PSR.  As to Count Three, the court imposed the mandatory minimum term of 84 months of imprisonment, consecutive.  ECF 69.  Therefore, the Court imposed a total sentence of 235 months of imprisonment.  *Id.*

Of relevance here, as to Count Two Judge Quarles said, ECF 184-2 at 16-17: "I am convinced, because a sentence at the bottom of the advisory sentencing guidelines is still a significant sentence, that such a sentence on such a guidelines sentence is sufficient but not greater than necessary . . . ."

Defendant did not note an appeal. *See* Docket. But, he subsequently filed a motion to vacate under 28 U.S.C. § 2255, alleging ineffective assistance of counsel. ECF 102.[2] By Memorandum and Order of September 11, 2020, I denied the motion to vacate. *See* ECF 169, ECF 170.

Howard, who was born in January 1977 (ECF 64 at 2), is now 47 years of age. He is currently incarcerated at the Terre Haute United States Penitentiary. *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed December 27, 2023). Defendant has served about 111 months, or 47 percent, of his sentence. *See* ECF 69 at 2. He has a projected release date of October 12, 2030. *See Find an inmate*, *supra*, https://www.bop.gov/inmateloc/.

## II.      Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Centeno-Morales*, ___ F.4th ___, 2024  WL 58475, at *2 (4th Cir. Jan. 5, 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022);

---

[2] Through the Office of the Federal Public Defender, Howard supplemented his submissions. ECF 117, ECF 123. But, he subsequently dismissed those submissions. ECF 139.

5

*United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).   But, "the rule of finality is subject to a few narrow exceptions."   *Freeman v. United States*, 564 U.S. 522, 526 (2011).   One exception is when the modification is "expressly permitted by statute."   *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.   The First Step Act ("FSA"), enacted in 2018, constitutes a statutory exception to the general rule, under certain circumstances.   *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)); *see also Centeno-Morales*, 2024 WL 58475, at *2; *United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).

Section 3582 of Title 18 of the United States Code was first enacted as part of the Sentencing Reform Act of 1984.   As originally enacted, it permitted a court to alter a sentence only upon motion by the Director of the Bureau of Prisons ("BOP").   *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).   This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief.   *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, compassionate release was an infrequent occurrence, because the BOP rarely filed such a motion on an inmate's behalf.   *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).   However, as a result of the enactment of the First Step Act in December 2018, a federal inmate could file a motion for

compassionate release directly with the court, so long as the inmate first exhausted administrative remedies.

With the passage of the FSA in 2018, Congress "broadened" the authority of courts to grant sentencing modifications. *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision constitutes "an exception" to the general rule that a federal sentence is final. *Ferguson*, 55 F.4th at 267; *see United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021). The FSA amounted to a sea change in the law.

In particular, the 2018 FSA authorized a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). That is, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.[3]

But, there are important restrictions. Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps," *Bond*, 56 F.4th at 383, and "the district court must conduct a two-step analysis." *Centero-Morales*, 2024 WL 58475, at *2.

---

[3] Section 3582(c)(1)(A) "does not require issue exhaustion." *Ferguson*, 55 F.4th at 269.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *Hargrove*, 30 F.4th at 194-95; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021). If that criterion is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Bond*, 56 F.4th at 384; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Significantly, "many case-specific facts fit under the broad umbrella of the Section 3553(a) factors." *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020). Moreover, under the factor of "respect for the law," the court may consider a defendant's plea agreement. *Bond*, 56 F.4th at 384.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169; *see Centeno-Morales*, 2024 WL 58475, at *3; *Bond*, 56 F.4th at 384; *Bethea*, 54 F.4th at 834; *Kibble*, 992 F.3d at 330. Notably, "when the same judge who sentenced the defendant rules on the compassionate release motion," it weighs against the finding of an abuse of discretion. *Bethea*, 54 F.4th at 834 (citation omitted); *see Centeno-Morales*, 2024 WL 58475, at *3. As the Fourth Circuit has said, "[w]hen the same sentencing judge assesses the § 3553(a) factors again for compassionate release purposes, there's a strong indication that the judge knows of the defendant's circumstances, both favorable and unfavorable, and considers the totality of the record when assessing whether a different sentence is now warranted." *Bethea*, 54 F.4th at 834 (citation omitted).

A district court abuses its discretion if "'it acts arbitrarily or irrationally, fails to follow statutory requirements, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error o flaw.'" *Centeno-Morales*, 2024 WL 58475, at *4 (citation omitted). And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

Of relevance, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)). The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). As indicated, amendments to the Policy Statement took effect on November 1, 2023.[4]

Prior to the amendments, the Policy Statement began: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. 1B1.13 (2021). Interpreting this language in *McCoy*, 981 F.3d at 282, the Fourth Circuit stated that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the Court held: "When a

---

[4] Defendant's Motion was filed on October 24, 2022 (ECF 180), before the amendments to U.S.S.G. § 1B1.13 took effect. But, the Court applies the law in effect at the time of its decision, not the law in effect at the time the Motion was filed. *Cf. Maryland Shall Issue, Inc. v. Governor Wes Moore*, 86 F.4th 1038, 1041 (4th Cir. 2023) (ruling in accordance with law in effect at the time of the appellate decision, not the law in effect at the time of the district court's decision). In any event, I would reach the same outcome under the law in effect before the amendments of November 1, 2023.

defendant exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *McCoy*, 781 F.3d at 281.  As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

As mentioned, the Fourth Circuit based its holding in *McCoy* and other cases on a version of the Policy Statement that has since been amended, effective November 1, 2023.  *See* Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (May 3, 2023) (providing notice of amendments to Congress).  In particular, as a result of the amendments that took effect on November 1, 2023, the Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ."   U.S.S.G.  §  1B1.13 (2023) (emphasis added).   Thus, the Sentencing Commission has made the Policy Statement expressly applicable to defendant-filed motions under § 3582(c)(1)(A).  *Cf. McCoy*, 981 F.3d at 282.

Therefore, it appears that the Fourth Circuit's conclusion in *McCoy*, 981 F.3d at 281, to the effect that "§ 1B1.13 is not an 'applicable' policy statement," is no longer consistent with the Guidelines, as amended.  This is because the Policy Statement is now expressly applicable to defendant-filed motions pursuant to 18 U.S.C. § 3582(c)(1)(A).

A court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A).   The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of

imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1) (A) extraordinary and compelling reasons warrant the reduction; or

(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

The Policy Statement identifies six circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *Id.* § 1B1.13(b)(1)– (6). These are as follows: certain medical circumstances of the defendant, such as terminal illness or the inability to receive specialized medical care while incarcerated, *id.* § 1B1.13(b)(1); the defendant's age, *id.* § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction, of a correctional officer, *id.* § 1B1.13(b)(4); the defendant received an "unusually long sentence," *id.* § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

Prior to the amendments, the district court was obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389, 2396 (2022); *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *United States v. Brice*, 2022 WL 3715086, at *2 (4th Cir. Aug. 29, 2022) (per curiam). Where appropriate, the district court had to "account not only for the circumstances at the time of the original offense but also for

11

significant post-sentencing developments."  *United States v. Mangarella*, 57 F.4th 197, 203 (4th Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3.  However, such developments did not warrant a recalculation of the Guidelines.  *Troy*, 64 F.4th at 184.

Notably, § 1B1.13(c) of the Policy Statement now specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement."  However, "if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction."  *Id.*

Section 1B1.13(d) of the Policy Statement is also relevant.  It provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.*  "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  *Id.*

Even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and

compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors).  Notably, the recent amendments to the Guidelines did not alter this requirement.

The "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)).  As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384–85.

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor." *Jenkins*, 22 F.4th at 170.  Nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release."  *Id.*; *see Chavez-Meza v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, as mentioned, a district court

abuses its discretion when, among other things, it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*). In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332. Notably, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

In any event, a defendant may not use a motion for compassionate release to collaterally attack his conviction or sentence. *Ferguson*, 55 F.4th at 270. As the *Ferguson* Court made clear, 28 U.S.C. § 2255 is generally "'[t]he exclusive remedy'" for such a challenge. (Citation omitted; alteration in *Ferguson*).

### III.  COVID-19

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[5]  *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted).  Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

The pandemic spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). Indeed, for a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).  Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus, which is extremely contagious.  *Pair*, 84 F.4th at 589; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS.  As the Fourth Circuit has put it,

---

[5] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

in the early months of 2020, "a new reality set in.  Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted." *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*  Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Philibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, REUTERS (May 12, 2022), https://perma.cc/TLA5-YNFB.  And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19. The CDC most recently updated its guidance in May 2023 to reflect the most current data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

**B.**

To be sure, the coronavirus is "highly contagious." *Pair*, 84 F.4th at 589.  At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.*  Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting.  *Seth*, 461 F. Supp. 3d at 248.  Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020),

https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 461 F. Supp. 3d at 248.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).   And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

There is no cure for the coronavirus.  But, medical therapies have continued to improve, and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W.  Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of the illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW. It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

As of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

**D.**

Much has changed since the coronavirus first emerged in early 2020. And, the virus, too, has changed repeatedly, with multiple strains and variants.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared that the pandemic was "over" in the United States. Alexander Tin, *Biden Says*

*Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic."  Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, at the time of this writing, data suggests that COVID-19 remains prevalent.  *See COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home  (last  updated  Dec.  16,  2023).  Moreover, available data may not provide a full picture of COVID-19's spread, because "[s]ince the end  of  the  public  health  emergency  on  May  11,  2023,  data  that  has  been  crucial  to understanding the spread and impact of Covid is reported by government sources less frequently, or is  no  longer  reported  at  all."  *Track Covid-19 in the U.S.*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2023/us/covid-cases.html (last updated Dec. 27, 2023).

## IV.   Discussion

### A.

In his Motion, Howard argues that there are at least three extraordinary and compelling reasons that warrant compassionate release.  ECF 180 at 2.

First, Howard argues that compassionate relief is warranted because, "based on the record and facts provided at his sentencing hearing," he "received a disparate sentence [in relation] to that of the two co-defendants in the case."  *Id.*  He explains: "At [the] sentencing hearing, it was established that [defendant's] role in the robberies did not involve the physical possession or brandishing of the firearm.  His co-defendants, however, did in fact carry that distinction."  *Id.*

According to Howard, his sentence was nonetheless "91 months above that of his co-defendant[s]." *Id.*

Second, Howard argues that an extraordinary and compelling reason for relief exists because, if sentenced today, he would no longer qualify as a Career Offender under U.S.S.G. § 4B1.1. *Id.* Defendant observes that in *United States v. Green*, 996 F.3d 176 (4th Cir. 2021), the Fourth Circuit held that Hobbs Act robbery does not constitute a "crime of violence" under U.S.S.G. § 4B1.1. *Id.* at 5. In particular, § 4B1.1(a)(2) provides, *inter alia*, that a defendant is a career offender if "the instant offense of conviction is a felony that is . . . a crime of violence . . . ." Defendant maintains that, because Hobbs Act robbery was the "instant offense" that supported his designation as a Career Offender under U.S.S.G. § 4B1.1(a)(2), the "Career Offender enhancement under U.S.S.G. § 4B1.2 no longer applies to his sentence." ECF 180 at 5.

Third, Howard urges the Court to consider "his efforts [while incarcerated] to comprehend the extent of his conduct and to correct his poor judgment and to become a more productive member of society upon his release from custody." *Id.* at 3. He observes that he has graduated from the "Challenge program," which "is based on Cognitive Behavioral Therapy." *Id.* According to defendant, he "was selected among many other candidates to become a mentor to his peer group." *Id.* Howard states: "It is because of his desire to change his life and . . . the excellent staff who recognized his potential while in the Challenge program that he will never commit anymore [sic] crimes." *Id.*

Defendant also argues that the sentencing factors under 18 U.S.C. § 3553(a) favor relief. *Id.* To illustrate his rehabilitation and reduced risk of recidivism, Howard refers the Court to "a copy of his BOP education history" and a "Recidivism Risk Assessment (PATTERN)," both of which are appended to the Motion. *Id.* (citing ECF 180-1 at 3–6). Defendant's education history

indicates that he has completed, *inter alia*, "1044" hours of pre-GED education, and 100 hours of "custodial maintenance" training. ECF 180-1 at 4. His Recidivism Risk Assessment indicates that he has a "General Score" of 49 and a "Violent Score" of 28. *Id.* at 6. However, defendant does not explain the significance of these scores.

In addition, defendant asserts that the supposed disparity between his sentence and the sentences received by his codefendants amounts to "an unwarranted sentencing disparity under § 3553(a)(6)." ECF 180 at 5.

With respect to the Court's interest in "protect[ing] the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), Howard asserts that "his post-sentence achievements, which include his mentorship in USP-Tucson's CHALLENGE program," indicate that he will not pose a danger to the public upon release. ECF 180 at 5. According to defendant, "the CHALLENGE program has properly prepared him to be a productive, law-abiding member of society." *Id.*

Howard has also provided the Court with general information about his plan for release. *Id.* at 6. Defendant states that he "has immediate family in the Baltimore, Maryland area," and that, upon release, "he will have a stable living environment" and "will not have to worry about basic living necessities such as food, a bed, and clothing." *Id.* Furthermore, according to defendant, "[h]is brother has strong ties to local businesses and has already promised to help him obtain gainful employment upon release." *Id.*

Finally, Howard asserts that he has satisfactorily pursued his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). *Id.* at 2. He attaches an "Administrative Remedy Procedure for Inmates Informal Resolution Form" to the Motion. ECF 180-1 at 2.

In its Opposition, the government argues, first, that Howard has failed to establish an unwarranted disparity between his sentence and the sentences received by his codefendants. ECF 184 at 6. The government acknowledges that defendant's sentence of 235 months was longer than the 108-month and 144-month sentences imposed on his two codefendants. *Id.* (citing ECF 82; ECF 88). But, according to the government, the question "in a sentencing is not . . . whether there is a difference between or among sentences, but whether the difference is *unwarranted*." ECF 184 at 9 (emphasis in original). And, in the government's view, "[a]lthough the sentences are *different*, there is no indication that any difference is unwarranted or improper." *Id.* at 6.

In particular, as the government observes, Judge Quarles concluded at sentencing that, given the specific circumstances of defendant's case, "if [the sentence] produces [a] disparate result, that would, I think, be a warranted disparity." *Id.* at 9 (citing ECF 184-2 at 10). In the government's view, defendant's sentence reflects the principle that "[l]egitimate, warranted disparities may arise" between sentences for similarly situated defendants according to "whether defendants choose to accept responsibility, their criminal histories, and other factors." ECF 184 at 9.

The government argues, second, that the fact that defendant, if sentenced today, would no longer qualify as a Career Offender does not amount to an extraordinary and compelling reason for relief. *Id.* at 10. To be sure, the government concedes "that the defendant is no longer a career offender in light of the Fourth Circuit's decision in [*Green*, 996 F.3d 176] that Hobbs Act robbery is not a career offender 'crime of violence.'" *Id.* The government also acknowledges that "the Fourth Circuit's decision in [*McCoy*, 981 F.3d 271] has been repeatedly cited for the proposition that changes in the law of sentencing and a resulting disparity between what a person received previously and what they would receive if sentenced today, may establish extraordinary and

compelling reasons under § 3582(c)(1)(A)." *Id.*  Nonetheless, the government maintains that defendant is not entitled to relief under the four factors applied by Judge Blake in *United States v. Myers*, CCB-01-188, 2021 WL 2401237 (D. Md. June 11, 2021) "to a § 3582(c)(1)(A) claim in which the defendant," citing *McCoy*, "argued that he was no longer a career offender."  ECF 184 at 11.

In *Myers*, 2021 WL 2401237, at *3, Judge Blake wrote that, under *McCoy*, a "district court may appropriately consider at the least the following four factors" when considering a motion for sentence reduction based on a change in the law:

> (1) [W]hether the sentence imposed is grossly disproportionate to a sentence the defendant would likely receive if sentenced today, signifying that the sentence is "dramatically longer than necessary or fair;" (2) whether the sentence imposed is unusually or grossly lengthy in comparison to sentences currently imposed for similar or more serious offenses; (3) the length of the sentence the defendant already has served; and (4) other personal characteristics of the defendant, which may include the defendant's relative youth at the time of the offense and their post-sentencing conduct in the BOP.

With respect to the first factor, gross disproportionality relative to the sentence that would be imposed today, the government states that, if defendant were not considered a Career Offender, his Guidelines range as to Count Two would be 130 to 162 months of imprisonment, instead of 151 to 188 months of imprisonment.  ECF 184 at 11–12.  "[A]ssuming that the defendant would now receive a sentence at the low end of the reduced range"—130 months—the government acknowledges that "there is arguably a 21-month difference between the sentence the defendant would receive today and what he is serving."  *Id.* at 12.  Nonetheless, the government insists that a 21-month disparity is not a "gross" disparity and "certainly not close to the decades of statutorily mandated time that [were] at issue in *McCoy*."  *Id.*

In regard to the second factor, unusual length in relation to sentences currently imposed for similar or more serious offenses, the government argues that defendant's sentence is consistent

with the sentences imposed for similar offenses.  *Id.* at 13.  In particular, the government asserts: "According to the . . . Sentencing Commission's analytical tool, the average sentence in the Fourth Circuit for robbery offenses under [G]uidelines § 2B3.1 for the period 2019–2021 was 159 months—actually [more] than the 151 months the defendant is currently serving for the Hobbs Act count."  ECF 184 at 13 (citing *Interactive Data Analyzer*, United States Sentencing Commission, https://ida.ussc.gov/analytics/saw.dll?Dashboard).  And, according to the government, "[f]or cases in Maryland specifically, the average sentence (using the same parameters) was 149 months," only "two months below the defendant's robbery sentence."  ECF 184 at 13–14 (citing *Interactive Data Analyzer*,           United           States           Sentencing           Commission, https://ida.ussc.gov/analytics/saw.dll?Dashboard).

As to the third factor, the amount of time defendant has served on his sentence, the government notes that the time defendant has served "represents a sentence of less [than] a year and a half for each of defendant's seven robberies."  *Id.* at 14.  In the government's view, "the amount of time the defendant has served does not support his request."  *Id.*

With respect to the fourth factor, the defendant's individual circumstances, the government insists that Howard's "personal background . . . does not support a sentencing reduction."  *Id.*  The government acknowledges that defendant "is completely free of any BOP disciplinary violations." *Id.* at 15.  But, in the government's view, "defendant's compliance with rules within the structured environment of BOP does little to reduce the obvious risks of recidivism and to the community reflected by his prior criminal history and his crimes."  *Id.*  In this regard, the government observes that because defendant committed the robberies when he was 36 years old, his "crimes cannot be attributed  to  youthful  misjudgment."   *Id.*  at  14.   Moreover,  according  to  the  government,

27

"defendant's many prior convictions suggest a risk of recidivism and a continuing danger to the community." *Id.* at 14–15.

In the government's view, the sentencing factors under 18 U.S.C. § 3553(a) counsel against compassionate release. *Id.* at 15–19. In particular, the government argues that the nature and seriousness of defendant's crimes disfavor relief because "defendant's offenses were violent, numerous, life-threatening, and undoubtedly terrifying to each of the victims of the robberies." *Id.* at 16. In addition, the government asserts that defendant's history and characteristics speak against compassionate release because, at the time of the robberies, "defendant had seven, serious convictions (including a sex offense involving a 13-year old victim, two failures to register as a sex offender, a handgun conviction, and an assault)." *Id.* at 17. According to the government, this "record suggests a risk of recidivism and a continuing risk to the community." *Id.*

In addition, the government contends that reducing defendant's sentence is not necessary to avoid unwarranted disparities in sentencing under 18 U.S.C. § 3553(a)(6). *Id.* at 18–19. According to the government, § 3553(a)(6) is concerned with "unjustified *nationwide* disparities among defendants," not disparities among codefendants. *Id.* at 18 (emphasis in Opposition). And, as noted, the government asserts that defendant's sentence is consistent with the nationwide average sentence for similar offenses. *Id.* Furthermore, the government reiterates that any disparity between defendant's sentence and the sentences received by his codefendants is warranted by "details that may be difficult to glean from the face of a sentence," such as "[n]on-public personal circumstances, health conditions, histories of abuse, cooperation, and subtle differences with respect to particular facts." *Id.*

In his Reply, Howard renews his argument that the change in the law governing Career Offender status, in combination with his good prison record, provide a basis for compassionate

release.  ECF 187 at 2.  He asserts, *id.*: "Howard invested four . . . years in USP-Tucson's Challenge program and has led a disciplinary free life in prison.  This fact, in conjunction with the change in law in *Green* . . . meets the statutorily-required finding of an 'extraordinary and compelling' reason to grant his motion."

**B.**

As an initial matter, I am satisfied that Howard has exhausted his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A).  Defendant submitted with the Motion an "Administrative Remedy Procedure for Inmates Informal Resolution Form," dated September 16, 2022, in which Howard states, in part: "I am seeking a sentence reduction of my 235 month sentence due to the sentence disparity between myself and that of the two co-defendants in the case, who[] received substantially lower sentences for the same conduct."  ECF 180-1 at 2. Howard has not provided the Court with information about whether and how the BOP responded the request.  However, the government concedes that "defendant has exhausted administrative remedies by seeking a reduction of sentence through the Federal Bureau of Prisons."  ECF 184 at 5.  Therefore, I shall consider the merits of defendant's Motion.

As noted, Howard argues that there are three extraordinary and compelling reasons for compassionate release: the disparity between his sentence and the sentences received by his codefendants, *see* ECF 180 at 2; the fact that, if sentenced today, he would not be designated a Career Offender, in light of the Fourth Circuit's holding in *Green*, 996 F.3d 176, *see* ECF 180 at 5; and his rehabilitation while incarcerated.  *See* ECF 187 at 2.

Section 1B1.13(d) of the Policy Statement provides that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."

29

Therefore, defendant's rehabilitation while incarcerated, although commendable, does not provide an extraordinary and compelling reason for relief.

Nor does the purported disparity between defendant's sentence and the sentences of his codefendants provide an extraordinary and compelling reason for relief. As Judge Bredar of this Court has observed, the "utility of . . . comparisons" between codefendants' sentences is limited by "the unique factual and procedural aspects of each codefendant[']s sentence[]." *United States v. Banks*, JKB-09-0288, 2022 WL 1028680, at *6 (D. Md. Apr. 6, 2022).

At sentencing, Judge Quarles expressly considered defendant's circumstances in comparison to the circumstances of his codefendants. *See* ECF 184-1 at 10. He concluded that any "disparate result . . . would . . . be a warranted disparity." *Id.* I see no reason to disturb Judge Quarles's considered decision that, in view of the specific circumstances of defendant's case, the disparity between defendant's sentence and the sentences of his codefendants is "warranted."

However, in my view, the disparity between defendant's actual sentence and the sentence he might receive under current law provides some basis for relief. Section 1B1.13(b)(6) of the Policy Statement provides:

> If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

The Policy Statement does not define the term "unusually long sentence." As a result, there is considerable uncertainty about when a sentence should be considered "unusually long." To illustrate, a sentence might be considered "unusually long" if it is significantly longer than the average of *all* sentences imposed in a given year, including sentences for less serious crimes. In

30

contrast, a sentence might be "unusually long" if it is significantly longer than the average national sentence imposed for similar offenses only. Even if a court decides that a defendant's sentence is appropriately compared to sentences imposed for similar crimes, certain questions remain: should the court compare the defendant's sentence to the average national sentence, the average in the circuit in which the court sits, or the average in the district in which the court sits?

In view of these uncertainties, I shall construe the phrase "unusually long sentence" in the manner most favorable to defendant. In particular, I shall consider defendant's sentence "unusually long" if it is significantly longer than the average of all sentences imposed nationwide in a given year.

According to the Sentencing Commission, the average length of the sentences imposed in 2022 was 51 months. *See Interactive Data Analyzer*, United States Sentencing Commission, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited Dec. 18, 2023). As noted, defendant's total sentence is 235 months, ECF 69 at 2, which is 184 months longer than the average sentence imposed in 2022. I am satisfied that defendant's sentence qualifies as "unusually long" when compared to the average sentence imposed in 2022.

The Policy Statement also leaves undefined the term "gross disparity." Again construing this undefined term in the manner most favorable to defendant, I conclude that the disparity between defendant's actual sentence and the sentence he would likely receive if sentenced today is a "gross disparity" that warrants relief.

As indicated, defendant was classified as a Career Offender on the basis that his offense of Hobbs Act robbery constituted a "crime of violence" under U.S.S.G. § 4B1.1(a)(2). ECF 64, ¶ 78; *see* ECF 54, ¶ 6(b). With respect to the Hobbs Act robbery conviction (Count Two), this designation elevated Howard's offense level from 30 to 32, before a three-point deduction for

acceptance of responsibility under U.S.S.G. § 3E1.1.  ECF 64, ¶ 78; *see* ECF 70 at 1.  In the Plea

Agreement (ECF 54), the government agreed to recommend a Guidelines sentence.  *Id.* ¶ 8.

Obviously, the upward adjustment to the offense level impacted the Guidelines calculation.  As to

Count Two, the government recommended a sentence of 151 months, which corresponded to the

bottom of the defendant's career offender Guidelines, as calculated based on the Career Offender

designation.  ECF 64, ¶ 154; ECF 184-2 at 15; ECF 70 at 1.  And, Judge Quarles adopted that

recommendation.  ECF 184-2 at 16-17.

However, if defendant has not been designated a Career Offender, his total offense level

for the Hobbs Act robbery conviction would have been 30, before deductions for acceptance of

responsibility.  ECF 64, ¶¶ 75, 77; ECF 54, ¶ 6(b).  In that circumstance, his Guidelines range for

Count Two would have been 130 to 162 months of imprisonment, rather than 151 to 188 months.

And, the government concedes that, if sentenced today, defendant would not qualify as a Career

Offender because in *United States v. Green*, 996 F.3d 176 (4th Cir. 2021), the Fourth Circuit joined

other circuits in concluding that Hobbs Act robbery does not constitute a "crime of violence"

within the meaning of U.S.S.G. § 4B1.1.  ECF 184 at 12.

In *Green* the Fourth Circuit considered for the first time whether Hobbs Act robbery

qualifies as a crime of violence within the meaning of U.S.S.G. §§ 4B1.1 and 4B1.2.  In doing so,

it utilized a time-tested analysis known as the categorical approach.  *See*, *e.g.*, *Taylor v. United

States*, 495 U.S. 575 (1990); *Descamps v. United States*, 570 U.S. 254 (2013).  The analysis itself

was not novel.  *See Descamps*, 570 U.S. at 260–61.

A defendant qualifies as a Career Offender if, among other things, the offense of conviction

is a felony that is a crime of violence.  *See* U.S.S.G. § 4B1.1(a)(2).  And, U.S.S.G. § 4B1.2(a)(1)

defines "crime of violence," in part, as an offense punishable by imprisonment for a term

exceeding one year that "has as an element the use, attempted use, or threatened use of physical force against *the person* of another[.]" (Emphasis added). In contrast, Hobbs Act robbery, 18 U.S.C. § 1951, criminalizes the commission or threat of "physical violence to any person *or property* . . . ." *Id.* § 1951(a) (emphasis added).

Under the categorical approach, the Fourth Circuit asked whether "Hobbs Act robbery could be committed, consistent with the elements, without satisfying the definition of crime of violence." *Green*, 996 F.3d at 180. If so, "then it is overbroad and not a categorical match." *Id.*

The Court observed that although Hobbs Act robbery involves harm to "person *or property*," *id.* (quoting 18 U.S.C. § 1951(b)(1)) (emphasis added), the Career Offender definition of "crime of violence" under the Guidelines is limited to use of force against *persons*. *See Green*, 996 F.3d at 180–184 (analyzing U.S.S.G. § 4B1.2(a)). In other words, "Hobbs Act robbery extends to a broader range of conduct—specifically, the use and threat of force against property, as well as persons—than" is encompassed by the definition of "crime of violence" under U.S.S.G. § 4B1.2(a). *Green*, 996 F.3d at 184. Therefore, the Court concluded that, under the categorical analysis, Hobbs Act robbery is not a crime of violence under U.S.S.G. § 4B1.1. *Id.*

In effect, *Green* applied existing law and "'explain[ed] what the law has always meant.'" *United States v. Aguilera-Rios*, 769 F.3d 626 (9th Cir. 2014) (quoting *United States v. Rivera-Nevarez*, 418 F.3d 1104, 1107 (10th Cir. 2005)). Nonetheless, I am satisfied that, by elucidating the application of the Career Offender provisions under the Guidelines, *Green* worked a "change in the law" for purposes of U.S.S.G. § 1B1.13(c). Under the categorical analysis as explained in *Green*, Hobbs Act robbery should not have been deemed a predicate offense for Career Offender purposes. And, had defendant been sentenced in accordance with *Green*, he would have had a final offense level of 27 for his Hobbs Act robbery conviction (Count Two). With a criminal

history category of VI, the Guidelines range for Count Two would then be 130 to 162 months of imprisonment.

As discussed, in the Plea Agreement the government agreed to recommend a sentence within the Guidelines range.  ECF 54, ¶ 8.  I recognize that 151 months falls within the revised Guidelines.  But, at sentencing, both the government and Judge Quarles looked to the bottom of the miscalculated, inflated Guidelines range.

The government acknowledges that, if defendant were to receive a sentence at the bottom of the range to which he would be subject if sentenced today, "there [would be] a 21-month difference between the sentence the defendant would receive today and what is he is serving." ECF 184 at 12.  In my view, under the circumstances of this case, a 21-month disparity is a "gross disparity."  *But see United States v. Myers*, CCB-01-188, 2021 WL 2401237, at *3 (D. Md. June 11, 2021) (concluding that, under law in effect before the Guidelines amendments of November 1, 2023, a potential disparity of 3.5 years, or 14 percent of the total sentence, did not amount to a gross disproportionality).

Therefore, under the circumstances attendant here, I conclude that the clarification in law effected by *Green*, 996 F.3d 176; the resulting disparity between the sentence defendant actually received and the sentence he would likely receive if sentenced today; and the government's agreement to recommend a Guidelines sentence, together provide an extraordinary and compelling reason for compassionate release.

### C.

Having determined that Howard has demonstrated an extraordinary and compelling reason for relief, I must consider whether a sentence reduction is consistent with the sentencing factors under 18 U.S.C. § 3553(a).  In my view, the sentencing factors favor a modest reduction of

defendant's sentence as to the Hobbs Act robbery conviction, from 151 months to 130 months of imprisonment, in conformance with the bottom of the actual Guidelines.  This results in a total sentence of 214 months of imprisonment.

As discussed, defendant's erroneous designation as a Career Offender inflated his Guidelines.  In the Plea Agreement, the government agreed to recommend a Guidelines sentence. The reduced sentence comports with the Guidelines that would apply if defendant were sentenced today.  Thus, the modification is consistent with the government's agreement.

I recognize that "the nature and circumstances of the offense" and defendant's substantial criminal history are troubling.  *See* 18 U.S.C. § 3553(a)(1).  Defendant participated in seven armed robberies of convenience stores.  *See* ECF 54, ¶ 6(a).  And, at the time of the instant offense, he had numerous prior convictions.  ECF 64, ¶¶ 96–123.

Nonetheless, defendant's prison record is commendable.  He has completed more than 1,000 hours of education courses, ECF 180-1 at 4.  And, as the government acknowledges, defendant "is completely free of any BOP disciplinary violations."  ECF 184 at 15.  The Court is permitted to consider defendant's efforts at rehabilitation, to the extent consistent with § 1B1.13(d).

It is also noteworthy that defendant's current sentence is significantly longer than any sentence defendant has ever served.  *See* ECF 64, ¶¶ 96–123.  Prior to the sentence at issue, defendant's longest period of continuous incarceration had been about four years.  *Id.*   In particular, for defendant's conviction for second degree rape in 2001, he was sentenced to eight years of imprisonment, four of which were suspended.  *Id.* ¶ 108.  And, initially, he only served about two years of the sentence, because Maryland permits parole.  *Id.*   However, because defendant violated the terms of his probation, he was sentenced to four years of imprisonment.  *Id.*

In addition, for defendant's conviction in 2004 for possession of heroin with intent to distribute, he received a sentence of seven years of imprisonment. *Id.* ¶ 111. But, he only served about four years of the sentence before his release. *Id.*

As to the underlying federal case, defendant has served more than nine years of imprisonment. The time already served by defendant is almost twice as long as any prior sentence he has ever served, and should prove to be a deterrent to future criminal conduct. This is especially so because defendant is now 47 years of age, with several years of his sentence left to serve. His age reduces the likelihood of recidivism. *See United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014).

I am also satisfied that a reduced sentence of 130 months of imprisonment as to the Hobbs Act robbery conviction (Count Two) adequately "reflect[s] the seriousness of the offense" and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a). Moreover, it promotes "respect for the law" when the government upholds its plea agreements. And here, the government had agreed to a Guidelines sentence. The original sentence for Count Two was at the bottom of a range determined by Guidelines that were incorrectly calculated. The reduction of Howard's sentence for Count Two, from 151 months to 130 months, comports with the corrected Guidelines.

In addition, I am mindful that the punitive effect of a sentence served during the pandemic is greater than that of a sentence served under normal conditions. *See United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("[T]he actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing.").

In sum, a 21-month reduction in defendant's sentence for Count Two is warranted.

**D.**

The FSA "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"   *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Indeed, the statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37–38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").

Relief may be granted under § 1B1.13(b)(6) of the Policy Statement only if, *inter alia*, "a defendant . . . has served at least ten years of the term of imprisonment."  As noted, Howard has served about 111 months, or nine years and three months, of his 235 month sentence.  By the Court's calculation, Howard is technically eligible for a reduction on or about September 3, 2024.

But, even with the 21-month reduction in the sentence, defendant will not be released before serving at least ten years of imprisonment.

Therefore, as a matter of judicial efficiency, I see no purpose to be served in delaying the issuance of this Memorandum Opinion or an Amended Judgment, merely because defendant has not quite completed ten years of his sentence of 235 months.  Even with the sentence reduction, defendant's sentence will substantially exceed ten years of imprisonment.  Accordingly, it would make no sense to wait until the ten-year mark to issue this ruling.

## V.  Conclusion

For the foregoing reasons, I shall grant the Motion, in part.  Defendant's sentence as to Count Two shall be reduced from 151 months of imprisonment to 130 months of imprisonment. Defendant's sentence as to Count Three shall remain unchanged, *i.e.*, 84 months of imprisonment, consecutive to his sentence for Count Two.   Therefore, defendant shall serve a total sentence of 214 months of imprisonment.

All terms and conditions of the supervised release imposed by the Judgment of September 4, 2014 (ECF 69) shall remain in effect.

An Amended Judgment shall issue.

An Order follows, consistent with this Memorandum Opinion.


Date:  January 10, 2024                                     _____/s/_____
                                                            Ellen Lipton Hollander
                                                            United States District Judge